# SMITH, A SLAVE, v. THE STATE.

1. Upon the trial of one for murder, it is not competent to prove the declarations of a third person, tending to the conclusion that he was guilty of the murder, and not the prisoner, as evidence in exculpation of the prisoner. If such third person examined as a witness, had implicated the prisoner by his testimony, it might have been received for the purpose of discrediting him, but was not competent testimony to establish the innocence of the prisoner, by fixing the crime upon the declarant.

2. Slaves, though living together as husband and wife, may be witnesses for or against each other, in a criminal case.

Writ of Error, allowed in vacation, by one of the Judges of this Court, to the Circuit Court of Dallas.

THE prisoner was indicted, tried and convicted on indictment for the murder of one Edmund, also a slave, at the fall term, 1845.

At the trial there was no direct or positive proof against the prisoner, but all the evidence was circumstantial. A slave named Sam was sworn and examined, and he denied all knowledge of the murder of Edmund, or of any participation of the accused with it. Sam had been tried and acquitted, the day previous to his examination, on a charge of the same murder. Evidence was adduced by the prisoner, that while Sam was in jail, during his trial, he became alarmed, and desired one Neal, a white man then also confined in jail, to request the jailor to send for his master, and then stated in Neal's presence, that he, Sam, had wrongfully accused the boy Smith of the murder of Edmund, and he wished so to tell his master, that he did not wish to die with a lie in his mouth and cause the innocent to suffer. Sam, on his examination, having stated some circumstances tending to implicate the prisoner, and an attempt having been made to attack his evidence, the court refused to allow Sam's statements made to Neal, to go to the jury for any other purpose than to

discredit him, and thus stated at the time the prisoner proposed to prove what Sam said in jail.

The prisoner, in attempting to establish the hypothesis, that Sam was the murderer, proved, that six months before Edmund's death, Sam was jealous of him and his own wife, and on that account, having found them together, very severely beat and wounded Edmund; that about four months before the death, Sam said Edmund and his wife were too intimate, and if he ever caught them together he would kill Edmund. Sam said the same about three months before the death; again about six weeks before, and again about two weeks before the death; that on the night Edmund was killed, Sam was at a negro house, about one mile from the place where Edmund was killed, that being within two or three hundred yards of Sam's house, and there said he must return home, for he had seen Edmund moving about all day, and he wanted to catch Edmund and his wife together. Edmund was found dead at the root of a tree, and seemed to have been sitting up and asleep when killed; there was the appearance by his side of some one having sat with him by the tree. Sam when in custody on the charge of murder, two or three days after the death of Edmund, stated that the prisoner had told him he killed Edmund with a gun barrel and had thrown that into a wash or hollow, near a walnut tree, and he would go and find it. His guard accompanied him to the place, where they found two shoe tracks, either of which fitted the shoes Sam wore on the night of the death, but they did not find the gun barrel. Against this hypothesis, the State attempted to establish, in connection with other circumstances, the jealousy of the prisoner, also, towards Edmund, and his own wife, and for that purpose introduced the prisoner's wife as a witness against him. The prisoner objected to her as incompetent, but the court allowed her to be sworn and examined.

The prisoner excepted to these several rulings of the court, and the presiding Judge signed and sealed a bill of exceptions.

Afterwards, during the same term, and before the prisoner was sentenced, his counsel moved the court for a new trial, on these grounds, to wit:

1. That Daniel W. Morgan, one of the jurors had formed and expressed an opinion of the guilt of the prisoner before the jury was impannelled and sworn.

5. That James McElroy, one of the jurors was under the belief, until the verdict, that the court had excluded all the testimony of the witness, Sam.

3. That the court should have allowed the declarations made by Sam while in jail, to go to the jury for other purposes than to discredit him.

4. The court erred in charging the jury, that if they believed the accused counselled and procured Sam to kill Edmund, not himself being present, that he was guilty, Sam having been acquitted.

5. The court erred in allowing the wife of the prisoner to be examined as a witness against him.

6. The verdict was contrary to law and evidence.

The prisoner's counsel proposed, and asked the leave of the court to argue and consider before it, the grounds for a new trial embraced in the motion, which were not placed on record by the bill of exceptions, the counsel stating he was prepared to prove the first ground of the motion by the affidavit of Morgan, the juror, and of other persons.

The court refused to allow the prisoner to be heard upon the grounds not embraced in the bill of exceptions, unless the prisoner would abandon and give up the said bill of exceptions. The prisoner thereupon refused to give up the bill of exceptions, and the court refused to hear the motion for a new trial, upon the grounds not embraced in the bill of exceptions.

The prisoner then excepted to this refusal, and the presiding judge signed a bill of exceptions to this as well as the matters previously stated.

The assignment of errors opens all the questions, as well those raised at the trial, as those growing out of the refusal to hear the motion for a new trial.

G. W. Gayle, with whom was Mr. Brocchus, for the prisoner, insisted—

1. It was competent for the prisoner to show that another committed the murder, and in this view the declarations of

the other slave should have been received. These tended to inculpate him, as well as to show that the prisoner was not the offender. The declarations in connection with the time and place, were strong circumstances, which should have been submitted to the jury. Evidence accusing another, must excuse the one on trial. [2 C. & H. Notes, 308, 389 ; 1 Starkie, 506, 507, 514.]

2. All the reasons which exclude the wife from being a witness for and against her husband, apply as well to slaves as free persons, and there is nothing in the condition of slavery which calls for the application of other than the general rules. The relation of husband and wife, is not dependent, necessarily upon municipal law and is of higher origin as it rests on natural law.

3. The action of the court in refusing to hear the motion for a new trial, was clearly against law, as several questions were presented by the motion, independent of those excepted to. The circumstance that a bill of exceptions was allowed on other points was no sufficient reason to refuse to hear those set out in reference to the erroneous charge.

The ATTORNEY GENERAL, contra, argued—

1. The declarations of Sam were properly restricted by the court to discrediting that witness ; although these more properly might have been rejected altogether, as no foundation was laid to discredit the witness. [1 Ross Cr. Ev. 170,] If introduced as an independent fact, the declaration was inadmissible. [Price v. Smith, 8 Watts, 447.] The declaration in itself comes to nothing, as it is the statement of A, that he knew nothing of the guilt of B. [Com. v. Chubback, 1 Mass. 143 ; Cowen & Hill's Notes, 703 ; The State v. May, 4 Dev. 308 ; Drummond's case, Leach, 308 ; 1 East note, 353.]

2. The laws of the State recognize no such relation as husband and wife between slaves. It is true, morality and decency require, and religion commands, that the moral relation shall exist, and be faithfully observed, but no rights or disabilities ensue from the relation, when slaves are the subject of it, because the municipal law neither regulates or recognizes it. [State v. Samuel, 2 D. & Battle, 177 ; Girod v. Lewis, 6 Mart. Lou. 559 ; Stephens on Slavery, 59 ; C. & Hill's Notes, 153 ; Wills v. Fletcher, 5 C. & P. 12 ; 4 Bing. 610.]

3. It was discretionary with the court to hear the motion for

the new trial or not to hear it'; the exercise of this discretion, or the refusal to exercise it, cannot be reviewed by this court. Com. v. Green, 7 Mass. 515; Minor, 43; 2 Stewart, 474; 3 Stew. & P. 444; 2 Porter, 182.] But even if this matter could now be reviewed, none of the grounds for the new trial are sufficient, nor is there any means to ascertain their verity if they were.

ORMOND, J.—Upon the trial of Smith, the prisoner, for the murder of a slave by the name of Edmund, Sam, a slave, was examined as a witness by the State, and denied any knowledge of the murder of Edmund, or of the participation of Smith in it, but had stated some circumstances tending to implicate Smith. The witness had been tried, and acquitted, the day before of the same murder, and the counsel for Smith, 'the prisoner, offered to prove, that whilst the trial of Sam was in progress, he being at the time in jail, became alarmed, and desired a white man present to send for his master—that he wished to tell him, that he did not want to die with a lie in his mouth, and cause the innocent to suffer, and the question is, whether this was admissible in evidence on the trial of Smith, for any purpose.

In my opinion, it was mere hearsay. It appears that Sam had previously stated, that Smith, a few days after the death of Edmund, had told him, that he killed Edmund with a gun barrel, and it appears to me very clear, that the only rational meaning that can be put upon the declarations of Sam, in jail, is, that he had accused Smith falsely to his master. His own trial was then in progress, he apprehended it would terminate fatally, and was thus impelled to make the confession. It cannot, in my opinion, by any just rule of interpretation, be construed into an admission that he was himself guilty of the murder of Edmund.

This being the true meaning of the declaration, if Sam, when Smith was on his trial, had repeated the false charge against him, the admission made in jail would certainly have been competent testimony to discredit him. But such was not the fact; he denied any knowledge of the participation of Smith in the murder of Edmund, and therefore, I think, it was not testimony for any purpose whatever. It appears that Sam in his testimony had detailed some facts, calculated to connect Smith with the murder, or, as stated in the bill of exceptions, " tending to implicate Smith ;" but his testimony as to these independent facts could not be im-

Smith v. The State.

peached, by proving that he had previously made a false decla-
ration about Smith, which he had afterwards recanted, such de-
claration having no connection with the facts deposed to. It is
an established rule of the law of evidence, that collateral matters
cannot be thus introduced, for the purpose of impeaching a wit-
ness.

Conceding, however, the true meaning of these declarations
of Sam in jail, to be, an admission of his own guilt, and that he
had killed Edmund himself, it does not, as I think, vary the case
in the slightest degree. The question to be ascertained was,
whether Smith was guilty of the murder, and any fact, or circum-
stance tending to prove that another was the guilty actor, would
be clearly competent, as its tendency would be to disprove the
guilt of the accused. But I think it is perfectly clear, that these
declarations were not facts, but mere hearsay; not made under
the sanction of an oath; not obligatory on the person making
them; and certainly could not be testimony either for or against
any one else. I admit there may exist, some rare and peculiar
cases, where circumstances may point to one of two persons as
being guilty of a crime, that the acts of one, fixing the guilt upon
himself, may be evidence in favor of the other. I say there may
possibly be such cases, though I find it very difficult to suppose
one. Take for example the case of the flight of one of two per-
sons, under the circumstances supposed. This is not necessari-
ly an admission of guilt; it may proceed from an unwillingness
to stand a public prosecution, or from a fear of the result, from
an inability to explain certain false appearances, indicating guilt,
though the party was innocent. The conduct of one accused of
crime, is the most fallible of all competent testimony. Those
emotions or acts which might be produced in one person by a
sense of guilt, or by the stings of conscience, might be exhibited
by another, differently constituted, by an overwhelming sense of
shame, and the degradation consequent upon a criminal accusa-
tion. The same cause producing opposite effects in different
persons, owing to weakness or strength of nerve, and other inex-
plicable moral phenomena. These difficulties are all increased,
when these doubtful and delusive circumstances are relied on,
upon the trial of another person, to prove that he is innocent, by
fixing the guilt upon another.

But independent of these considerations, the declaration of

Sam was not an act, within the meaning of the doctrine I have been discussing. If such acts could ever be admissible in evidence, in favor of third persons, it must be on the ground, that being the spontaneous result of the operations of the mind, they indicate with reasonable certainty, the existence of those facts, of which they are the manifestation. But to give this effect to the mere declarations of third persons, would be a most alarming innovation upon the criminal law. Such a declaration would not be obligatory on the person making it. He might afterwards demonstrate its falsity, when attempted to be used against him. Such testimony may be a mere contrivance, to procure the acquittal of the accused, and is not like an act, springing out of the surrounding circumstances, *prima facie* evidence of the act asserted, in favor of or against third persons, whatever may be its effect upon the speaker.

No English authority has been cited, which, as I understand them, lends any countenance to the introduction of such testimony; and in this country, where the question has been distinctly made, it has been rejected. [The State v. May, 4 Dev. 308, and The Commonwealth v. Chubbock, 1 Mass. 143.]

I again repeat, that the true meaning of the admission, is not a confession of guilt, but of having made a false statement; but in any possible interpretation of its meaning, it was correctly refused for the purpose for which it was offered.

The other question, of the admissibility of the wife of the prisoner as a witness, is one of great interest, which we have not time, if it were proper to consider, in all the various bearings in which it has been presented. It is sufficient to say, that whilst we admit the moral obligation, which natural law imposes, in the relation of husband and wife, among slaves, all its legal consequences must flow from the municipal law. This does not recognize, for any purpose whatever, the marriages of slaves, and therefore there is no prohibition against the husband and wife being witnesses for, or against each other. This subject has been so fully and ably examined in the court of a sister State, that it would be useless in us to attempt to add any thing to the reasoning of that decision. [State v. Samuel, 2 Dev. & Bat. 177.]

As to the refusal to hear the motion for a new trial, although we think the Circuit Court should never refuse to entertain one in a criminal case, so far as to determine, whether it shall or shall

not be granted, yet it is a matter wholly within the legal discretion of the court, and certainly is not the subject of revisal by writ of error.

From this view it results, that the judgment of the Circuit Court must be affirmed, and the day appointed by the Circuit Court for the execution of the prisoner having elapsed, it is considered by this court, that the prisoner, Smith, suffer the penalty of death, in the mode pointed out by the law, on Friday, the fourth day of September next, between the hours of ten o'clock of the forenoon and four o'clock of the afternoon of that day, and the sheriff of Dallas county, is hereby charged with the execution of this sentence.

GOLDTHWAITE, J., DISSENTING.—The evidence offered at the trial, of the declarations made in jail by the slave Sam, at first impressed me much in the same manner as it did the court below, but further reflection has convinced me, they should have been left to the jury, in connection with the other circumstances. The effort of the prisoner was to show such a condition of facts and circumstances as to create the impression on the minds of the jury, that Sam, in point of fact, was the murderer, the evidence against himself being, as stated, entirely circumstantial. I apprehend, although it may be true, that the confessions of a third person of his guilt, is not evidence in favor of another when standing alone, and unaided by other facts or circumstances, yet that it is so, whenever the party confessing is connected with the crime by strong presumptive circumstances. An illustration as apt as any may be drawn from the circumstances of this case.

If the facts and circumstances in proof, pointed equally to the prisoner and Sam as the guilty individual, can it be supposed for a moment, that the confession of the one thus applying all the circumstances of the case to himself, might not be evidence for the other—not as declarations of his innocence, but as showing a condition of facts inconsistent with his guilt. I do not understand the decision in Commonwealth v. Chubbock, 1 Mass 144, as holding that confessions of guilt may not in *some cases* be given in evidence, but only that *mere* declarations will not be evidence. In Cowen & Hill's Notes, 703, the attempt of the writer is to controvert a position assumed by Mr. McCord in a note to a case reported by him, that confessions of guilt by third persons may

*always* be given in evidence. He goes no further than to con‑ trovert the general position, and says the confession would no$^t$ be strengthened by the surrender of the party making it, as it ye$^t$ would be liable to suspicion, inasmuch as the confessing party might afterwards disprove it. But when the other facts and cir‑ cumstances connect the party with the act, and the confession is made under circumstances which repel the suspicion of any mo‑ tive, I can see no reason why a doubtful crime may not be thus fixed on the confessing person, though the fact of that confession may tend to exculpate another, to whom the circumstances equal‑ ly point as the guilty person. But it is said there was no con‑ fession here, to charge Sam; true it *is* not a confession in terms, but when the attending facts are looked to, there is some ground at least to make it proper to go to the jury, for them to determine whether it is sufficient to enable them to say it was an admission of his own guilt. It seems to fall within that class of presumptive evidence which grows out of the acts of a party when charged with the transaction. [Best. Pres. Ev. 325, § 251.] A some‑ what curious case in illustration of the rule is given in Willis on Circum. Ev. 101.] An individual was suspected of a robbery, after a lapse of four years, and an officer was sent to make the arrest. He asked the accused, without informing him of the ob‑ ject of the inquiry, where he resided three years past, and receiv‑ ed a direct answer, but when he immediately afterwards inquir‑ ed where the party resided *four* years before then, the individual fell down in a swoon. There is, I think, no rational doubt that facts like these, and confessions or declarations which connect themselves with the circumstances attendant upon the crime, are proper evidence, whether to prove guilt upon the guilty, or the innocence of others, by showing where the guilt lies. On this point I think the court erred, and therefore dissent from the opin‑ ion just pronounced.

Note.—The prisoner was pardoned by the Executive.